IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

In re:  DEPUY ORTHOPAEDICS, INC.,     )
ASR™ HIP IMPLANT PRODUCTS     )  MDL Docket No. 1:10-md-2197
LIABILITY LITIGATION     )
     )  JUDGE DAVID A. KATZ
This Document Relates to:     )
     )
**ALL CASES**     )
     )
     )

---

**DEFENDANTS' MOTION FOR ORDER ADOPTING
PLAINTIFF FACT SHEET AND DEFENSE FACT SHEET**

---

DRINKER BIDDLE & REATH LLP
A Delaware Limited Liability Partnership
500 Campus Drive
Florham Park, New Jersey 07932-1047


TUCKER, ELLIS & WEST LLP
1150 Huntington Building
925 Euclid Avenue
Cleveland, Ohio 44115

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

    INTRODUCTION AND PROCEDURAL HISTORY ................................................... 1

    LEGAL ARGUMENT ........................................................................................................ 4

I.     SOCIAL MEDIA QUESTIONS TO PLAINTIFFS SHOULD BE PERMITTED .......... 4

        A.     The Proposed PFS Questions Seek Relevant And Discoverable
             Information. ................................................................................................. 4

        B.     Basic Discovery Principles Favor Disclosure And Apply Equally
             To Social Media As Recognized by the Courts. ...................................... 10

        C.     Defendants' Requests For Social Media Information Should Be
             Included On The Plaintiff Fact Sheet. .................................................... 15

II.    PLAINTIFFS' SOCIAL MEDIA QUESTION FOR THE DEFENDANTS IS
      INAPPROPRIATE FOR INCLUSION ON THE DEFENDANTS' FACT SHEET ...... 16

III.   DISCOVERABILITY OF THIRD-PARTY LITIGATION FUNDING FROM
      THE PLAINTIFFS SHOULD BE PERMITTED .......................................................... 18

IV.   PLAINTIFFS' REQUESTS FOR BROADSPIRE AND LABCORP
      INFORMATION IN THE DEFENSE FACT SHEET SHOULD BE DENIED ............. 26

        A.     Discovery From Broadspire Should Be Denied. ................................................. 26

        B.     Discovery From LabCorp Should Be Denied. .................................................... 29

V. CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

Anderson v. Sotheby's Inc.,
  No. 04 Civ 8180 (SAS) (DFE), 2005 U.S. Dist. LEXIS 9033 (S.D.N.Y. May 13,
  2005) ...................................................................................................................25, 26

Berger v. Seyfarth Shaw LLP,
  No. C 07-05279 JSW (MEJ), 2008 WL 4570687 (N.D. Cal. Oct. 14, 2008)...................21

Berger v. Seyfarth Shaw LLP,
  No. C 07-05279 JSW (MEJ), 2008 WL 4681834 (N.D. Cal. Oct. 22, 2008)........20, 21, 24

Beye v. Horizon Blue Cross Blue Shield of New Jersey,
  No. 06-5337, 2007 WL 7393489 (D. N.J. Dec. 14, 2007) .................................................15

City & County of San Francisco v. Superior Court,
  37 Cal. 2d 227 (1951) ........................................................................................................15

City Stores Co. v. Lerner Shops of District of Columbia, Inc.,
  410 F.2d 1010 (D.C. Cir. 1969)..........................................................................................20

Conlon v. Rosa,
  Nos. 295907, 295932, 2004 Mass. LCR LEXIS 56 (Mass. Land Ct. July 21,
  2004) ......................................................................................................................... passim

Dexter v. Dexter,
  No. 2006-P-0051, 2007 WL 1532084 (Ohio Ct. App. May 25, 2007)..............................14

Doe v. MySpace, Inc.,
  528 F.3d 413 (5th Cir. 2008) ...............................................................................................5

Duininck Brothers v. Howe Precast, Inc.,
  No. 4:06-cv-441, 2008 U.S. Dist. LEXIS 73999 (E.D. Tex. Sept. 22, 2008)...................25

E.E.O.C. v. Simply Storage Management, LLC,
  270 F.R.D. 430 (S.D. Ind. 2010)...................................................................11, 12, 13, 14

Executive Jet Aviation, Inc. v. United States,
  507 F.2d 508 (6th Cir. 1974) ..............................................................................................20

F. L. Crane Co. v. Cessna Aircraft Co.,
  74 F.R.D. 414 (N.D. Miss. 1977)........................................................................................20

In re FedEx Ground Package Sys.,
No. 3:05-MD-527 RM (MDL-1700), 2007 U.S. Dist. LEXIS 16205 (N.D. Ind.
Mar. 5, 2007)..................................................................................................19, 21

Glenfed Development Corp. v. Superior Court,
53 Cal. App. 4th 1113, 62 Cal. Rptr. 2d 195 (Cal. App. 2d Dist. 1997)...........................19

Gadolinium Medical Cases,
JCCP No. 4546, CJC-08-004546 (SF Superior Ct., May 29, 2009) ...................................9

Gadolinium Contrast Dyes Products Liability Litigation
MDL No. 1909, 1:08-gd-50000 (N.D. Ohio, June 16, 2008) .............................................9

Hill v. National Collegiate Athletic Association,
7 Cal. 4th 1 (1994) .........................................................................................................14

Jones v. Clinton ("Jones I"),
No. LR-C-94-290 (E.D. Ark. Nov. 25, 1997)..................................................................21

Jones v. Clinton ("Jones II"),
No. LR-C-94-290 (E.D. Ark. Dec 4, 1997) ....................................................................21

Lenz v. Universal Music Corp.,
No. 07-3783, 2009 U.S. Dist. LEXIS 105180 (N.D. Cal. Oct. 29, 2009) ........................24

In Re: Levaquin Products Liability Litigation,
MDL No. 08-1943 (JRT) (D. Minn. Feb. 20, 2009)....................................................9, 10

MCI Telecommunications Corp. v. Crowley,
899 S.W.2d 399 (Tex. App. 1995).................................................................................25

Margolis v. Gosselin,
No. 95-J-959 (Mass. App. Ct. Dec. 18, 1995) ..........................................................21, 22

Marrero v. Feintuch,
418 N.J. Super. 48, 11 A.3d 891 (NJ Super. App. Div. 2011)...........................................19

McMillen v. Hummingbird Speedway, Inc.,
No. 113-2010 CD, 2010 WL 4403285 (Pa. Com. Pl. Sept. 9, 2010)..........................12, 13

Merrill v. Waffle House, Inc.,
227 F.R.D. 467 (N.D. Tex. 2005) ..................................................................................11

Miller v. Pruneda,
No. 3:02-CV-42, 2004 U.S. Dist. LEXIS 28254 (N.D. W. Va. Nov. 5, 2004) ................26

Moreno v. Hanford Sentinel, Inc.,
    172 Cal. App. 4th 1125 (2009) ...................................................................14

Net2Phone, Inc. v. eBay, Inc.,
    No. 06-2469, 2008 U.S. Dist. LEXIS 50451 (D. N.J. June 25, 2008)..............................24

Offenback v. L.M. Bowman, Inc.,
    No. 1:10-CV-1789, 2011 WL 2491371 (M.D. Pa. June 22, 2011)............................10, 11

People ex rel. Lockyer v. Superior Court,
    19 Cal. Rptr. 3d 324 (Cal. App. 4 Dist. 2004) ..................................................28

Rancman v. Interim Settlement Funding Corp.,
    789 N.E.2d 217 (Ohio 2003)...................................................................23, 24

In re Richardson,
    31 N.J. 391, 157 A.2d 695 (N.J. 1960) .........................................................24

In Re: Risperdal Litigation,
    No. 00296 Case ID 100300296 (Pa. Com. Pl. Nov. 2, 2010) ...........................................10

Romano v. Steelcase Inc.,
    907 N.Y.S.2d 650 (2010) ................................................................ passim

Save Open Space Santa Monica Mts. v. Superior Court,
    84 Cal. App. 4th 235 (Cal. App. 2d Dist. 2000) ..........................................18, 19

The Way International v. Executive Risk Indemnity, Inc.,
    No. 3:07cv294, 2009 WL 3157402 (S.D. Ohio Jan. 27, 2009) ..........................................27

Triandafilou v. Kravchuk,
    No. 95-J-355 (Mass. App. Ct. May 30, 1995) .........................................21, 22

**STATUTES**

Cal. Const. Art. I, § 1 ...............................................................................14

Cal. Civ. Proc. Code § 367 .........................................................................20

Cal. Civ. Proc. Code § 2017.010 ...............................................................10, 18

Cal. Civ. Proc. Code § 2031.010 ...................................................................28

18 U.S.C. § 2701 *et seq*...........................................................................11

**RULES**

Fed. R. Civ. P. 17 ..........................................................................................................20

Fed. R. Civ. P. 26(b)(1) ...........................................................................................10, 18

Fed. R. Civ. P. 34(a)(1) ..................................................................................................28

Fed. R. Civ. P. 45(c) ......................................................................................................27

N.J. Court Rule R. 4:10-2 ........................................................................................10, 19

N.J. Court Rule R. 4:18-1 ...............................................................................................28

N.J. Court Rule R. 4:26-1 ...............................................................................................20

**MISCELLANEOUS**

6A Charles Alan Wright et al., *Federal Practice & Procedure* § 1541 (2010) ................20, 22, 23

24 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5484 (1st ed.) ...........24

## INTRODUCTION AND PROCEDURAL HISTORY

The Plaintiff Fact Sheet ("PFS") and Defense Fact Sheet ("DFS") are basic **case-specific** discovery instruments to be answered in each individual case where the plaintiff has had revision surgery.  The parties endeavored to negotiate a PFS and DFS which would be used in the three main consolidated jurisdictions – MDL, California, and New Jersey.   See Exhibit A to Certification of Deirdre R. Kole ("Kole Cert.") – Agreed Upon PFS showing areas of Dispute in Red; Exhibit B to Kole Cert – Agreed Upon DFS showing areas of dispute in red.  They were successful save for these three discrete issues:

1. **Social Media**.  Social media are the modern day equivalent of personal diaries and notes which have long been discoverable.   Defendants ask that the PFS include these questions:

> 25.  Have you ever posted or written anywhere on the internet about DePuy, ASR or the  injuries you allege were caused by the ASR hip, including but not limited posting on Facebook, MySpace, Twitter, LinkedIn, Flickr, digg or FourSquare)?
>
> Yes _____  No _____
>
> If Yes, for each, please identify when and where you have posted:
>
> Type        URL or Web Address        Username/Profile
>
>
> If the website or social media is not open to the public, please print out all postings where you have discussed DePuy, ASR or the injuries you allege were caused by the ASR hip and preserve the site.
>
> REQUEST NO. 9:  Any documents, including diaries, journals, calendars, e-mails, texts, postings on websites, blogs, and social media accounts (e.g., Facebook, MySpace, or Twitter) or other notes prepared by plaintiff or plaintiff's representative, other

> than plaintiff's attorneys, concerning DePuy, ASR and any issue
> in this case, plaintiff's physical and emotional health
> (excluding communications with your attorney).

Plaintiffs object to these questions.

2. **Third party funding.** This question will identify the persons and entities who have a financial interest in the Plaintiff's case such that settlement decisions and strategy could be impacted.

> 24. Other than your retention agreement with your attorney or
> any lien or repayment obligations related to medical expenses,
> has anyone entered into a transaction, contract or other
> agreement which creates an obligation to pay or repay money
> that is contingent on the outcome of your case?
>
> Yes _____  No _____
>
> If Yes, please attach a copy.

Plaintiffs object to this question.

3. **Discovery from Broadspire and LabCorp.** In the DFS, Plaintiffs seek information from entities not parties to this litigation, namely Broadspire which assists claimants in reimbursement of medical and out of pocket expenses, and LabCorp, a commercial entity in the business of doing laboratory testing as ordered by healthcare providers. For the reasons set forth below, the defense opposes this discovery at this time and in the alternative, submits that if the Plaintiffs want it, they should be responsible for the costs of obtaining it, which are outlined in the Certification of Jeffrey Sickles.

> 1. Identify any claim file that has been opened by Broadspire
> concerning Plaintiff, including the date the file was opened and
> any file number assigned.
>
> 2. Identify all Communications between Broadspire (and
> anyone acting on Broadspire's behalf) and any of Plaintiff's
> Healthcare Providers about Plaintiff. Please provide a

> description of the Communication, the date the Communication was made and the general subject matter of the Communication.
>
> 3. Identify all Communications between Broadspire (and anyone acting on Broadspire's behalf) and Plaintiff. Please provide a description of the Communication, the date the Communication was made and the general subject matter of the Communication.
>
> 4. Identify all payments made to Plaintiff directly, or others on Plaintiff's behalf, by Broadspire. For each payment, please Identify the Person who made the payment, the Person paid, the amount paid, the date paid and the reasons for such payment.
>
> 5. Produce all documents Broadspire has obtained directly from the Plaintiff.
>
> 6. Produce all documents Broadspire and/or LabCorp has obtained from sources other than Plaintiff ( Plaintiff's Healthcare providers, employers, insurers, or others) using an authorization executed by Plaintiff. Identify any and all payments made by Broadspire on behalf of Plaintiff to any medical providers who have asserted or may assert liens against Plaintiffs recovery.
>
> 7. Identify and produce all medical or laboratory records relating to plaintiff obtained by DePuy, Johnson and Johnson and/or Broadspire through the use of a written authorization provided to LabCorp pursuant to Broadspire instruction and/or direction.

Late in the negotiations, counsel representing the MDL and New Jersey plaintiffs in the PFS and DFS negotiations added to the proposed DFS a broad and novel "tit for tat" question related to Defendants' employees' and agents' use of social media:

> H. 1.  Please identify the following for all DePuy/Johnson and Johnson in-house salespeople, product representatives, independent or employed distributors, as follows:
>
> Do you have a blog, website or social media account (including but not limited to profiles on Facebook, MySpace, Twitter, LinkedIn, Flickr, digg or FourSquare) where you have discussed DePuy, ASR hips, ASR hip failures, ASR sales, Metal on Metal hips, or your communications or interactions of any kind with physicians to whom you have marketed ASR hip components?

> If Yes, for each, please identify:
>
> Type          URL or Web Address          Username/Profile
>
> *    If the website or social media is not open to the public,
> please print out all postings where you have discussed DePuy
> ASR hips, ASR hip failures, ASR sales, Metal on Metal hips, or
> your communications or interactions with physicians to whom
> you have marketed ASR hip components

The same counsel also added a question related to Defendants' internal budget and cost structure:

> I.  Please identify the settlement value of plaintiff's claim.
>
> Please identify the names of all defense firms retained in the
> defense of this action, including the lead counsel at each firm.
>
> > For each such firm, please identify the funding arrangement
> > including whether the payment structure is straight billable
> > hours, capped billable hours, incentive based, or something
> > else.
> >
> > Please identify the hourly billable rates for each lawyer and
> > other professional that has been asked to work on this
> > matter.

Defendants oppose these questions, which are intrusive, inappropriate, and not case-specific.

## LEGAL ARGUMENT

## I.    SOCIAL MEDIA QUESTIONS TO PLAINTIFFS SHOULD BE PERMITTED.

### A.    The Proposed PFS Questions Seek Relevant And Discoverable Information.

Defendants seek narrowly tailored discovery to allow them to: (1) locate the public portions of Plaintiffs' Facebook, MySpace, Twitter, or other similar social media accounts likely

to contain relevant information related to these personal injury lawsuits, and (2) obtain from Plaintiffs self-screened portions of their social media accounts directly concerning this litigation. Defendants request that this Court rule as courts before it have ruled, and permit the discovery of relevant social media.

Plaintiffs in these coordinated proceedings each allege that they were implanted with one of two hip implants, the ASR™ XL Acetabular System or the ASR™ Hip Resurfacing System (collectively, "ASR™ Hip"). Plaintiffs received these implants because damage to their hip joints caused pain and/or restricted their mobility.

Given the nature of these lawsuits, a Plaintiff's ability to perform everyday activities, such as standing up and sitting down, may be relevant to his or her case. The advent of the Internet and social media has placed a large volume of information publicly describing the daily activities of individuals online for anyone with access to the Internet to see. Any such evidence describing an individual Plaintiff's alleged mobility level and overall quality of life is discoverable in his or her case.

Defendants seek information that Plaintiffs have made publicly available on social media, as well as any of Plaintiffs' social media content that directly concerns the issues being litigated. The Fifth Circuit has defined social media, or social networking, as follows:

> Online social networking is the practice of using a Web site or other interactive computer service to expand one's business or social network. Social networking . . . begins with a member's creation of an online profile that serves as a medium for personal expression, and can contain such items as photographs, videos, and other information about the member that he or she chooses to share with other . . . users. Members have complete discretion regarding the amount and type of information that is included in a personal profile.

*Doe v. MySpace, Inc.*, 528 F.3d 413, 415 (5th Cir. 2008).

The very "social" nature of social media means that much of the information contained in social media accounts concerns the activities of Plaintiffs' everyday lives.  With websites such as Facebook, MySpace, and Twitter, "people can share information about their lives, including posting photographs and sharing information about what they are doing or thinking." *Romano v. Steelcase Inc.*, 907 N.Y.S.2d 650, 653 (2010).  Such descriptions, ranging from posts written from the couch to photos showing a Plaintiff crossing the finish line at a marathon, are common on social media.  And unlike their closest physical equivalents (diaries, journals, and the like), social media content is by definition always shared.

With these requests, Defendants seek two types of information.  First, Defendants request that Plaintiffs identify the location *of that information available to the public at* large, and second, as to information which is not open to the general public – copies of what is posted which relates to the parties and the injuries alleged here.

The fact that such information is not private is readily ascertainable from the privacy policies of the major social media providers.[1]  While access to some social media content is restricted, either by password or other control, Defendants **are not seeking blanket access** to any party's social media account via the Plaintiff Fact Sheet.  Rather, Defendants simply seek to

---

[1] *See, e.g.,* Facebook, Privacy Policy, https://www.facebook.com/policy.php (last visited July 6, 2011) ("Information set to "everyone" is publicly available information, just like your name, profile picture, and connections.  Such information may, for example, be accessed by everyone on the Internet (including people not logged into Facebook), be indexed by third party search engines, and be imported, exported, distributed, and redistributed by us and others without privacy limitations."); Myspace.com, Privacy,
http://www.myspace.com/index.cfm?Fuseaction=misc.privacy (last visited July 6, 2011) ("MySpace also allows Users to browse for certain Profile Information in order to help connect with Members (i.e., schools and/or companies where Users may have attended or worked)."); Twitter, Privacy Policy, http://twitter.com/privacy (last visited July 6, 2011) ("Our Services are primarily designed to help you share information with the world. Most of the information you provide to us is information you are asking us to make public. This includes not only the messages you Tweet and the metadata provided with Tweets, such as when you Tweeted, but also the lists you create, the people you follow, the Tweets you mark as favorites or Retweet and many other bits of information."). Privacy policies are attached to the Kole Cert. as Exhibit C.

efficiently identify the location of the public aspect of each Plaintiff's social media accounts and request that he or she preserve any posts discussing the issues in this litigation.

Specifically, Defendants have narrowly tailored their Social Media Request to seek only information identifying the location of Plaintiffs' public social media accounts. With the Social Media Document Request, Defendants ask that Plaintiffs produce all nonprivileged documents, in the form of social media or otherwise, written by Plaintiffs that *directly* concern the issues being litigated here.

The Social Media Document Request is limited to those documents relating to that which Plaintiffs themselves put at issue when they filed these lawsuits. Whether such information exists on paper, on Plaintiffs' home computers, on the Internet, on social media, or anywhere else; documents created by Plaintiffs that concern the issues in these lawsuits are discoverable.

Defendants do not ask that an individual Plaintiff turn over every picture, post, or other communication that he or she may have placed on the Internet. Defendants similarly do not seek any Plaintiff's passwords or other sensitive information. Rather, Defendants ask only that the responding Plaintiff identify the location of *the public portion* of each of his or her social media accounts, as well as information that *directly concerns* the issues in the responding Plaintiff's case. The Social Media Request is therefore limited to the identification of information that Plaintiffs have already placed on the Internet for the world to see, while the Social Media Document Request is limited to documents relating to material Plaintiffs themselves placed at issue by filing these lawsuits.

Although all of the information requested via Defendants' Social Media Request is publicly available in that it may be viewed by anyone with Internet access, responses identifying the location of each Plaintiff's specific accounts will save time and hasten discovery for all

parties.  Take for example, a hypothetical plaintiff named Jane Smith, a resident of Los Angeles. Ms. Smith maintains a social media account (in this case a "blog") where she documents her progress training for marathons.  There may be dozens of Jane Smiths who appear to be about the same age, live in Los Angeles, and who may even run marathons.  In the second and third columns of the Social Media Request, "URL or Web Address" and "Username/Profile," Defendants simply request that Ms. Smith identify her specific blog from among the many possibilities.  Such discovery will not only streamline Defendants' attempt to find the information, it will conserve the resources of Ms. Smith and her attorneys who will avoid unnecessary time and effort at deposition responding to questions related to social media accounts not her own.

Even if Ms. Smith's blog could eventually be found by Defendants with a blind, exhaustive search, its early identification on the Plaintiff Fact Sheet would save considerable effort and facilitate an earlier evaluation of Ms. Smith's case.  Further, for a subset of Plaintiffs, the social media accounts containing potentially relevant information will not be directly associated with that Plaintiff's legal name or disclosed alias and will therefore be difficult for Defendants to locate – or may be located only after Plaintiff's deposition.  Nevertheless, any such relevant social media account remains publicly available, and should be discoverable before any deposition, even if written under a nickname.  In a mass tort context, the clarification provided by the self-identification of social media is an important part of streamlining the orderly process of coordinated discovery.  Resolving this issue at this stage, rather than leaving such discovery for case-specific inquiries, will prevent the time-consuming discovery motions which will inevitably result.

Requests for social media information such as the ones here are reasonable and are commonplace on initial fact sheets in the mass tort context.  For instance, in the Gadolinium Cases, both Judge Kramer in California and Judge Polster in the Multidistrict Litigation approved a Plaintiff Fact Sheet containing the following question and document request:

> 23.  Have you ever used the internet to search, read or engage in discussions, in chatrooms, weblogs (blogs) or message boards containing information relating to the claims made in this lawsuit, including but not limited to NSF and contrast agents:
>
> Yes __ No __ Cannot recall __.
>
> If yes, list the websites, chatrooms, weblogs (blogs), and/or message boards: ____.
>
> Document Request: All documents in your possession, custody or control, concerning or relating to NSF/NFD.

*See* Plaintiff Fact Sheet, *Gadolinium Medical Cases*, California Judicial Council Coordinated Proceeding No. 4546, CJC-08-004546 (San Francisco Superior Court, May 26, 2009); *Gadolinium Contrast Dyes Products Liability Litigation*, Multidistrict Litigation No. 1909, 1:08-gd-50000 (N.D. Ohio, Jun. 16, 2008).

A different MDL court approved an even broader set of fact sheet requests, reaching not only documents written by plaintiffs, but any material *read* by plaintiffs.

> 20(b).  Have you ever used a computer to look for information on the internet about Levaquin®, and/or to look for information about tendon injuries or fluoroquinolones manufactured or distributed by anyone else . . . If Yes, describe the information or materials you located and state whether you have a printed copy of the materials. (If you have any materials please produce a copy.)
>
> 20(d).  Have you ever read or posted to any weblogs (blogs) or message boards regarding Levaquin®, and/or tendon injuries or fluoroquinolones manufactured or distributed by anyone else . . . If Yes, describe what you read or posted, and state whether you have a printed copy of the materials. (If you have any materials please produce a copy.)

*See* Plaintiff Fact Sheet, *In Re: Levaquin Products Liability Litigation*, MDL No. 08-1943 (JRT) (D. Minn. Feb. 20, 2009).

Finally, such requests are not unique to California or the federal system.  In a Pennsylvania coordinated action, the Court approved similar document requests as part of the initial Plaintiff's Fact Sheet:

> 18.  Print-outs of all websites, social networking sites or blogs, including but not limited to Facebook, Twitter, MySpace, and Skype, which are maintained or created by You and which refer to Your injuries allegedly caused by Risperdal®, or the risks and/or benefits of Risperdal®, or which refer to this litigation.

> 19.  Print-outs of internet postings or communications, including but not limited to public forums, message boards, Facebook, Twitter, MySpace, and Skype, made by You and which refer to Your injuries allegedly caused by Risperdal®, or the risks and/or benefits of Risperdal®, or which refer to this litigation.

*See* Case Management Order No. 3, Exhibit B, *In Re: Risperdal Litigation*, No. 00296, Case ID 100300296 (Pa. Com. Pl. Nov. 2, 2010).

### B.    Basic Discovery Principles Favor Disclosure And Apply Equally To Social Media As Recognized by the Courts.

Any party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. *See e.g.,*  Fed. R. Civ. P. 26(b)(1); Cal. Code Civ. P. § 2017.010; N.J. Court Rule 4:10-2(a).  Discovery is not limited to admissible evidence, but extends to matters reasonably calculated to lead to the discovery of admissible evidence. *See id.*

While social media is itself new, the underlying principles of discovery are long settled in favor of disclosure. *See Offenback v. L.M. Bowman, Inc.*, No. 1:10-CV-1789, 2011 WL 2491371 (M.D. Pa. June 22, 2011) (Granting in part defendant's motion to compel social media discovery, the Court "recognizes that the scope of discovery into social media sites requires the application of basic discovery principles in a novel context, and that the challenge is to define appropriately

broad limits . . . on the discovery ability of social communications.") (internal citation omitted) (attached as Exhibit D to Kole Cert.); *E.E.O.C. v. Simply Storage Management, LLC,* 270 F.R.D. 430, 434 (S.D. Ind. 2010) (the challenge of social media discovery is "not one unique to electronically stored information generally or to social networking sites in particular").

Absent a specific privilege, relevant personal communications, recollections, notes, and even a party's personal diaries are discoverable in a civil lawsuit. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 417-72 (N.D. Tex. 2005) (collecting cases allowing discovery of personal diaries in personal injury suits). In fact, this evidence often tells the most accurate version of the story from a plaintiff's own perspective. *See id.* There is no reason to treat social media any differently than physical media or to create a privilege to protect what is in essence a *shared* online diary while leaving its physical equivalent open to discovery.

While courts in only a handful of jurisdictions have addressed whether a party's social media information is discoverable, the weight of authority has found that social media is properly subject to discovery.[2] Instructive here is *Romano v. Steelcase*, a well-reasoned opinion cited in dozens of articles and treaties. 907 N.Y.S.2d 650. In *Romano*, a New York trial court ordered discovery, not only of the identity and location of a plaintiff's social media accounts, but the content of the non-public portions of those accounts. *Id.* at 654. The plaintiff claimed damages for permanent personal injury which left her confined to bed. However, at deposition, the plaintiff was confronted with evidence that her public Facebook profile page showed her enjoying the outdoors, apparently after the date of the claimed injury. *Id.* In granting the defendant access to the non-public portions of the plaintiff's social media accounts, the Court

---

[2] The Stored Communications Act, 18 USC § 2701 *et seq.*, prohibits social media providers from responding to various types of third-party subpoenas or document requests. Because the requests in this case are directed at Plaintiffs and not the social media providers, the Stored Communications Act does not apply.

found that because the plaintiff had put her physical condition at issue, the requested information was relevant, material, and necessary to the defense of the action. In other words, because the plaintiff alleged that her injuries caused a loss of mobility and a lower quality of life, and because the social media information was reasonably likely to contain evidence that might contradict her claim, the information was discoverable. *Id.* at 657.

In another leading case, a federal district court in Indiana was asked to determine whether claimants in a Title VII discrimination action could be required to produce complete copies of their social media accounts, including the non-public portions. *Simply Storage Management,* 270 F.R.D. 430. The Court held that because social media postings were likely to reflect the emotional state of the complainant, they were therefore relevant and discoverable: "It is reasonable to expect severe emotional or mental injury to manifest itself in some [social media] content, and an examination of that content might reveal whether onset occurred, when, and the degree of distress." *Id.* at 435.

Here, like in *Romano* and *Simply Storage Management,* the requests for Plaintiffs' social media is reasonably calculated to show whether a Plaintiff is active or home-bound, enjoys outdoor sports or more sedentary activities, leads a normal life or is in constant pain, goes for long jogs or has limited mobility. Simply put, the requested social media is likely to contain information relevant to the core of Plaintiffs' allegations and condition leading to implantation of the product at issue.

In *McMillen v. Hummingbird Speedway, Inc.*, No. 113-2010 CD, 2010 WL 4403285 (Pa. Com. Pl. Sept. 9, 2010) (attached as Exhibit E to Kole Cert.), a Pennsylvania trial court found a personal injury plaintiff's social media information to be relevant and nonprivileged, and therefore discoverable. In that case, the plaintiff at deposition attempted to conceal information

on his Facebook and MySpace accounts by claiming that information was confidential and

therefore not properly subject to discovery.  Upon viewing the public portions of the plaintiff's

accounts and finding material that appeared to contradict plaintiff's story, defendant moved for

an order compelling plaintiff to allow defendant full access to his accounts.  *Id.* at *1.  While

apparently conceding the relevance of the social media information sought, the plaintiff in that

case in effect asked "the [c]ourt to recognize communications shared among one's private

friends on social network computer sites as confidential and thus protected against disclosure."

*Id.* at *2.  The *McMillen* Court properly declined to create such a privilege:

> Facebook, MySpace, and their ilk are social network computer
> sites people utilize to connect with friends and meet new people.
> That is, in fact, their purpose, and they do not bill themselves as
> anything else. Thus, while it is conceivable that a person could use
> them as forums to divulge and seek advice on personal and private
> matters, it would be unrealistic to expect that such disclosures
> would be considered confidential.

*Id.*  Because plaintiff's social media accounts contained information likely to be relevant, and

because no privilege exists to shield information that is not held in confidence, the *McMillen*

Court granted the defendant's motion to compel access to both the public and "private" sections

of those accounts.  *Id.* at *4.

The Court in *Simply Storage Management* likewise ordered discovery of both public and

non-public portions of the requested social media information.  Although only self-identified

relevant portions of social media are at issue here, the *Simply Storage Management* Court

broadly held that that *all* portions of "locked" or "private" sections of the claimants' social media

accounts were discoverable.  A "person's expectation and intent that her communications be

maintained as private is not a legitimate basis for shielding those communications from

discovery." 270 F.R.D. at 434.  Any privacy interests implicated by the production of non-public

information could "be addressed by an appropriate protective order, like the one already entered in this case." *Id.* The *McMillen* and *Simply Storage Management* Courts' refusal to create a social media privilege was well founded. Just as there is no "private diary privilege," there is no "social media privilege," nor should one be created now.

Similarly, the *Romano* Court found that the minimal privacy interests the plaintiff in that case had in her social media posts, given the fact that they were by definition shared, were outweighed by the defendant's need for the information. *See Romano,* 907 N.Y.S.2d. at 656, *citing Moreno v. Hanford Sentinel Inc.*, 172 Cal. App. 4th 1125 (2009) (no person would have a reasonable expectation of privacy where that person took the affirmative act of posting his or her own writing on social media); *see also Dexter v. Dexter*, No. 2006-P-0051, 2007 WL 1532084, at *6 n.4 (Ohio Ct. App. May 25, 2007) (there is no reasonable expectation of privacy regarding MySpace writings open to public view) (attached as Exhibit F to Kole Cert.). The Court pointed out that, given social media sites' millions of users, "privacy is no longer grounded in reasonable expectations, but rather in some theoretical protocol better known as wishful thinking." *Romano,* 907 N.Y.S.2d. at 657 (internal citations omitted).

Both the Social Media Request and the Social Media Document Request are consistent with the privacy protections in the California Constitution. Cal. Const. Art. I, § 1. For information to be protected from discovery in California on privacy grounds, the claimant must (1) possess a legally protected privacy interest, (2) have a reasonable expectation of privacy under the circumstances, and (3) the invasion of privacy must be serious in scope. *Hill v. National Collegiate Athletic Assn.*, 7 Cal. 4th 1, 35-40 (1994). As discussed above, neither request violates any recognized privacy interest and any expectation of privacy in social media information Plaintiffs themselves have put on the Internet could not be reasonable but, in the

words of the *Romano* Court, just "wishful thinking."  907 N.Y.S.2d at 657.  Further, the law has

long recognized that where a plaintiff brings an action that puts his physical condition at issue,

he may not prevent disclosure of information relevant to that condition "on the ground that

disclosure of his condition would cause him humiliation.  He cannot have his cake and eat it

too."  *City & County of San Francisco v. Superior Court*, 37 Cal. 2d 227, 232 (1951) (Traynor,

J.).  Finally, this Court may of course order the requested social media information produced

pursuant to the protective order already entered in this case, just as the *Simply Storage

Management* Court did.

In New Jersey, the issue was addressed in *Beye v. Horizon Blue Cross Blue Shield of New

Jersey,* No. 06-5337, 2007 WL 7393489 *1 (D. N.J. Dec. 14, 2007) (attached as Exhibit G to

Kole Cert.), where the Court was asked to rule on a broad discovery request seeking "emails,

journals, diaries and communications" concerning plaintiffs' symptoms.  Although heightened

because the plaintiffs in that case were minors, "[t]he privacy concerns are far less where the

beneficiary herself chose to disclose the information." *Id.* at *2.  The Court therefore ordered the

production, not only of the journals and diaries that had been shared with others, but all non-

public social media information related to the subject matter of the lawsuit as well.  The two

requests for social media information here are strikingly similar to those approved in *Beye* and

are fully consistent with that opinion.

    **C.**    **Defendants' Requests For Social Media Information Should Be Included On
The Plaintiff Fact Sheet.**

The information sought by Defendants with the Social Media Request, the location of the

public portions of Plaintiffs' social media accounts, is by no means sensitive information.

Plaintiffs have already placed such information on the Internet for the world to view.  In the

words of one social media provider, social media "is about sharing information with others." *See*

Facebook, Privacy Policy, https://www.facebook.com/policy.php (last visited July 6, 2011) (*see* Exhibit C to Kole Cert.).  Defendants' Social Media Document Request is a run-of-the-mill discovery request aimed at all documents written by Plaintiffs about the issues in this case.  To shield the social media information it seeks because they were placed online to be shared with others would be incomprehensible.  Accordingly, the two requests at issue here are more conservative than the requests approved in *McMillen*, *Simply Storage Management*, and *Romano*, or diary content ordered disclosed by the *Merrill* Court, among others.

Social media websites exist for people to share what they are doing, thinking, and feeling—the very type of information that would document the extent of the injuries claimed in these cases—with others.  With the social media requests at issue here, Defendants aim to discover information that could shed light on Plaintiffs' mobility and quality of life.  Because such information is relevant and nonprivileged, Defendants are entitled to its discovery.

## II.    PLAINTIFFS' SOCIAL MEDIA QUESTION FOR THE DEFENDANTS IS INAPPROPRIATE FOR INCLUSION ON THE DEFENDANTS' FACT SHEET.

In contrast to Defendants' requests for social media information on the PFS, Plaintiffs' proposed DFS question regarding social media is  burdensome, not reasonably tailored to lead to admissible evidence, is on its face general and *not* case-specific, and has no place on a fact sheet intended to assist the parties develop an understanding of the unique details of individual claims.

First and foremost, the proposed question is not case-specific.  As such, it does not even belong in this category of discovery.

Second, it is overly intrusive in that it seeks information related to the personal life of a very large group of individuals, many of whom (distributors and representatives) are not employees of the defendants, without limitation as to time, place, or context.  It is inappropriate for an employer to demand that its employees provide links to social media accounts created

outside the scope of employment. Even if Plaintiffs' proposed DFS question was a proper topic for non-case-specific discovery (it is not), it is simply inappropriate for inclusion on a case-specific fact sheet.

As detailed above, an individual Plaintiff puts his or her medical condition at issue by filing a lawsuit. The Plaintiff's social media account is quite likely to contain evidence relevant to his or her claim, particularly regarding that Plaintiff's mobility and day-to-day activities. On the other hand, an individual employee should not be subject to the same level of discovery simply by virtue of holding a job. The Defendants' employees' non-professional, *social* media accounts, while they in all likelihood contain considerable personal information, are vanishingly unlikely to lead to the discovery of any admissible evidence related to any Plaintiff's claim. Even if an individual employee had expressed his or her non-expert, personal viewpoint regarding DePuy or the ASR™ Hip System, such views are simply not relevant. An employee's chatter amongst his or her friends are not DePuy statements, nor should DePuy be required to defend against each and every such statement, if any. An employer could not (and should not) have access to this type of material. Additionally, unlike Plaintiffs who placed their personal physical condition at issue when they chose to file suit, DePuy employees have done nothing to put their social activities at issue in this case.

Notwithstanding all of this, Defendants have offered as a compromise to inquire of employees **who will be deposed** whether such internet information exists, and to advise Plaintiffs' counsel of that response two weeks before the employee's deposition.

### III.    DISCOVERABILITY OF THIRD-PARTY LITIGATION FUNDING FROM THE PLAINTIFFS SHOULD BE PERMITTED.

In question VII., 5, d., Defendants seek the identity of any entities other than Plaintiffs, their attorneys and medical lienholders  who may have a financial stake in the outcome of Plaintiffs' cases, i.e., any third-party funders involved in the litigation.   The basis for this discovery is simple:  DePuy has a right to know whom it is litigating against.

"Third-party litigation funding" describes the practice of providing money to a party (usually a plaintiff or plaintiff's attorney) in connection with his or her pursuit of a potential or pending lawsuit.  By the terms of the arrangement, the plaintiff or the attorney is required to repay the money at a high rate of interest (many multiples of current market rates), but only if the litigation is successful (that is, only if money is recovered).   Although the arrangements are described as "non-recourse loans," the plaintiff or the attorney essentially grants the third party a financial interest in the plaintiff's suit or the attorney's contingent recovery.

In order to determine whether any plaintiff or attorney has obtained third-party litigation funding in this litigation that could affect Plaintiffs' litigation positions, DePuy proposed the following question to be included in the PFS:

> Other than your retention agreement with your attorney, or any lien or repayment obligations related to medical expenses, has anyone entered into a transaction, contract or other agreement which creates an obligation to pay or repay money that is contingent on the outcome of your case?
> If yes, please attach documentation of the agreement.

Federal Rule of Civil Procedure 26 and its state-court equivalents permit discovery into "any matter, not privileged, that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1); *see also* Cal. Civ. Proc. Code § 2017.010 ("any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action"); *Save Open Space Santa Monica Mts. v. Superior Court*, 84 Cal. App. 4th 235, 246, 100 Cal.

Rptr. 2d 725, 732 (Cal. App. 2d Dist. 2000) ("As a general rule, a party may obtain discovery regarding unprivileged matters that [are] relevant to the subject matter involved in the pending action or to the determination of any motion made in that action . . . .") (internal quotation marks and citation omitted); N.J. Court R. 4:10-2 ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action"); *Marrero v. Feintuch*, 418 N.J. Super. 48, 59, 11 A.3d 891, 898 (N.J. Super. Ct. App. Div. 2011) ("Rule 4:10-2(a) allows parties to obtain discovery regarding any matter, not privileged, which . . . relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]") (internal quotation marks and citations omitted). "In the context of discovery, evidence is 'relevant' if it might reasonably assist a party in evaluating its case, preparing for trial, or facilitating a settlement." *Glenfed Dev. Corp. v. Superior Court*, 53 Cal. App. 4th 1113, 1115, 62 Cal. Rptr. 2d 195, 197 (Cal. App. 2d Dist. 1997). Relevancy is "construed broadly," and the Court has "broad discretion" in deciding whether particular discovery should be compelled. *In re FedEx Ground Package Sys.*, No. 3:05-MD-527 RM (MDL-1700), 2007 U.S. Dist. LEXIS 16205, at *4 (N.D. Ind. Mar. 5, 2007) (attached as Exhibit H to Kole Cert.); *see also Save Open Space Santa Monica Mts.*, 84 Cal. App. 4th at 245, 100 Cal. Rptr. 2d at 732 ("Management of discovery lies within the sound discretion of the trial court."); *Marrero*, 418 N.J. Super. at 59, 11 A.3d at 898 ("[O]ur courts have held that rules of discovery are to be liberally construed and accorded the broadest possible latitude.") (internal quotation marks and citation omitted).

Here, the information sought by DePuy is highly relevant because third-party funding agreements insert the interests of a stranger into the litigation. Indeed, the presence of third parties – who are often calling the shots from behind the scenes – raises legitimate questions

about who is the real party in interest in a particular case. *See* Fed. R. Civ. P. 17; Cal. Code Civ. Proc. § 367; N.J. Court Rule 4:26-1; 6A Charles Alan Wright et al., *Federal Practice & Procedure* § 1541, at 475 (2010) (the real party in interest is "the person who, according to the governing substantive law, is entitled to enforce the right" upon which the claim for relief is premised). Although a person claiming physical injury from a product is often a real party in interest in product-liability litigation, that is not always so. For example, the "general rule in federal courts is that if [an] insurer has paid the entire claim" – whether in personal-injury cases or other contexts – "it is the real party in interest and must sue in its own name." *Id.* at 500 & n.3 (collecting illustrative cases). This is true even when the insurer purports to "loan" money to its insureds, at least where the so-called loan is repayable only to the extent of any recovery made against the alleged tortfeasor at trial, and where the insurer obtains some measure of control over the litigation. *See, e.g., Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 513 (6th Cir. 1974); *City Stores Co. v. Lerner Shops of District of Columbia, Inc.*, 410 F.2d 1010, 1014-15 (D.C. Cir. 1969); *F. L. Crane Co. v. Cessna Aircraft Co.*, 74 F.R.D. 414 (N.D. Miss. 1977). Third-party funding poses essentially the same scenario: "loans" that are provided on a non-recourse basis in consideration for transfer of the right to recover proceeds from the injured party's claim.

Recognition of this transfer of interest has driven a number of courts considering third-party funding of the sort at issue here to conclude that evidence of such funding is "clearly relevant." *Conlon v. Rosa*, Nos. 295907, 295932, 2004 Mass. LCR LEXIS 56, at *5 (Mass. Land Ct. July 21, 2004) (attached as Exhibit I to Kole Cert.); *see also, e.g., Berger v. Seyfarth Shaw LLP*, No. C 07-05279 JSW (MEJ), 2008 WL 4681834, at *3 (N.D. Cal. Oct. 22, 2008) (information related to third-party funding in exchange for proceeds of the suit was "relevant" to

the question of bias on the part of the third party and therefore "discoverable") (attached as Exhibit J to Kole Cert.); *Berger v. Seyfarth Shaw LLP*, No. C 07-05279 JSW (MEJ), 2008 WL 4570687 at *1 (N.D. Cal. Oct. 14, 2008) (attached as Exhibit K to Kole Cert.); *In re FedEx Ground Package Sys.*, 2007 U.S. Dist. LEXIS 16205, at *7-8, *13-14 (finding that plaintiffs had to produce certain information pertaining to plaintiffs' relationship with labor union where defendant "argue[d] that the [labor union] [was] directing, at least in part, Plaintiffs how to run this litigation for the sole benefit of the [union]").  In *Conlon*, for example, plaintiffs brought suit challenging a decision of the zoning board of appeals to allow a developer to demolish existing buildings and construct a Walgreen's drugstore on the site.  2004 Mass. LCR LEXIS 56, at *1-2. One of the plaintiffs owned property near the site and leased her property to Brooks Drugs, a competitor of Walgreen's.  *Id.* at *2.  The developer challenged the plaintiff's asserted status as a real party in interest and demanded disclosure of any funding agreement between her and Brooks Drugs, contending that Brooks Drugs was driving the litigation.  *See id.* at *2-3 (describing discovery requests).  The plaintiff objected, contending that evidence of such an agreement was not relevant.  But the Court disagreed, holding that litigation funding was "surely a relevant subject to explore in discovery."  *Id.* at *6-7.  In so concluding, the Court warned that "[s]uch hidden funding can introduce a dynamic into a plaintiff's case – an agenda unrelated to its merits, a resistance to compromise – that otherwise might not be present and, unless known, cannot be managed or evaluated."  *Id.* at *6-7.[3]

---

[3]  In its ruling, the court noted that "[a] surprising number of plaintiff's lawsuits are secretly funded by outsiders" and relied on several unreported trial court rulings ordering the production of documents pertaining to litigation funding. *Id.* at *5-6 (citing *Jones v. Clinton ("Jones II")*, No. LR-C-94-290 (E.D. Ark. Dec. 4, 1997) (ordering production of documents showing contributions to plaintiff); *Jones v. Clinton ("Jones I")*, No. LR-C-94-290 (E.D. Ark. Nov. 25, 1997) (same); *Margolis v. Gosselin*, No. 95-J-959 (Mass. App. Ct. Dec. 18, 1995) (upholding Superior Court Order allowing discovery into whether plaintiff filed and pursued her lawsuit "in aid of a super-market operator that competed with Star Market"); *Triandafilou v. Kravchuk*, No. 95-J-355 (Mass. App. Ct.

(Continued)

Here too, DePuy is entitled to know the identities of the parties against whom it is litigating. A quick internet search reveals that there are already a number of entities offering funding for lawsuits against DePuy related to the ASR Hip prosthesis. *See, e.g.,* Fair Rate Funding, DePuy ASR Hip Replacement Products' Liability Lawsuits Total Over 1,000, http://www.fairratefunding.com/lawsuit-funding-news/2011/07/13/153/ (explaining that potential ASR plaintiffs "may be eligible to receive lawsuit funding" in the form of a loan that "need not be repaid if the case is unsuccessful") (attached as Exhibit L to Kole Cert.); Twitter update from Steve Mingle, http://twitter.com/#!/steve_mingle, May 18, 2011 ("We are now funding DePuy plaintiffs for living expenses & treatment") (attached as Exhibit M to Kole Cert.); E-mail from Steve Mingle, Plaintiff Support, June 15, 2011 ("Plaintiff Support provides pre-settlement, non-recourse funding to plaintiffs who are involved in personal injury cases, including DePuy Hip. To date, we have provided funding to hundreds of plaintiffs involved in mass tort cases.") (attached as Exhibit N to Kole Cert.). Without knowing whether these and other third parties have reached agreements with any plaintiffs in this litigation, DePuy's ability to "manage[]" and "evaluate[]" its litigation position would be substantially prejudiced. And the effect of these arrangements is something that should be determined at the beginning rather than the end of litigation. Otherwise, DePuy could very well litigate a case, only to be faced with a claim by a dissatisfied third-party funder that it is the real party in interest and not bound by the resolution of the claim. Such an outcome would be directly contrary to the purposes of Rule 17, which was intended to ensure that the defendant has the opportunity from the outset "to present [its]

---

(Continued)

May 30, 1995) (directing production of documents showing funding of challenge to supermarket expansion by a competing supermarket chain)).

defenses against the proper persons, to avoid subsequent suits, and to proceed to finality of judgment." *See* Wright, *supra*, § 1541, at 465 (internal quotation marks and citation omitted).

Understanding the nature of any ASR-related third-party funding arrangement is also in the Courts' own interests because experience demonstrates that if third-party funding issues are not explored in the early stages of mass-tort proceedings, they are likely to create problems later. In the Vioxx MDL litigation, for example, a plaintiff named Larry Long borrowed $9,150 from a company called Oasis Legal Finance.  When he settled with Merck 18 months later, Oasis claimed he owed the company 87 percent of the settlement award – $23,588 out of $27,000 – based on an interest rate of 100 percent per year. *See* Tr. *In re Vioxx Prods. Liab. Litig.*, No. 05-1657 (E.D. La. Dec. 21, 2009) (attached as Exhibit O to Kole Cert.); *see also* Binyamin Appelbaum, *Lawsuit Loans Add New Risk For The Injured*, N.Y. Times Jan. 16, 2011, http://www.nytimes.com/2011/01/17/business/17lawsuit.html?pagewanted=all  (attached  as Exhibit P to Kole Cert.).  And Long was not the only Vioxx plaintiff to regret his entanglement with third-party funders.  Just last month, a plaintiff filed a RICO suit claiming that a law firm persuaded more than 200 Vioxx plaintiffs to take out high-interest loans from a company run by the firm's lawyers and/or relatives. *See* Compl., *Poole v. Eichholz Law Firm, P.C.*, No. CV411-136 (S.D. Ga.) (attached as Exhibit Q to Kole Cert.).

Similarly, in *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217 (Ohio 2003), a plaintiff received $6,000 from a company called Interim Settlement Funding as an advance of funds secured by her pending claim against her insurance company for an automobile accident.  The agreement was that Rancman would repay $16,800 if the case were resolved in one year, $22,200 if resolved in 18 months, and $27,600 if resolved in 2 years.  Rancman later borrowed an additional $1,000, which was secured by the next $2,800 she expected to collect on

her claim. Rancman settled for $100,000 within 1 year, and Interim Settlement Funding demanded $19,600, representing a return to the lender of more than 225%. *See id.* at 217. In such circumstances, the *Rancman* Court observed, plaintiff's obligation to pay the third party out of the proceeds of any award operates as an "absolute disincentive" to settle. *Id.* at 220-21.[4]

In response to all of these arguments, plaintiffs have suggested that they should only have to reveal third-party funding if the lender is given an official say in settlement. But this would turn a straightforward, easily verifiable question into one that is subjective and useless. As a practical matter, no funding agreement will ever explicitly assign a lender the ability to make settlement decisions. It is only when any settlement discussions begin that plaintiffs will know whether their lenders intend to exert influence on the process. Thus, the alteration plaintiffs suggest would allow virtually every plaintiff to simply answer no without reducing any of the risks posed by undisclosed third-party funding arrangements. Plaintiffs' suggested alternative is also improper because it presumes that the effect of third-party funders would not be felt in the litigation unless the funder holds the ultimate decision-making power as to the settlement. Not so. Rather, "[t]he potential for bias and its effect on the case" that "arises out of the additional

---

[4]    To the extent plaintiffs argue that the information sought by DePuy is protected by the attorney-client privilege or the related common-interest privilege, such arguments should be rejected. The attorney-client privilege applies to any communication made between privileged persons, in confidence, for the purpose of obtaining or providing legal assistance for the client. *See, e.g., Lenz v. Universal Music Corp.*, No. 07-3783, 2009 U.S. Dist. LEXIS 105180, at *4 (N.D. Cal. Oct. 29, 2009) (attached as Exhibit R to Kole Cert.); *Net2Phone, Inc. v. eBay, Inc.*, No. 06-2469, 2008 U.S. Dist. LEXIS 50451, at *18 (D. N.J. June 25, 2008) (attached as Exhibit S to Kole Cert.). The information DePuy seeks to discover here is not privileged because it is well settled that fee arrangements do not constitute privileged communications. *See Conlon*, 2004 Mass. LCR LEXIS 56, at *8-9 (rejecting privilege claim against disclosure of third-party funding information); *see also* 24 Fed. Prac. & Proc. Evid. § 5484 (1st ed.) ("the general tenor of the federal case law" is that "the fee arrangement between an attorney and his client is generally not privileged"); *accord, e.g., Berger v. Seyfarth Shaw LLP*, No. C 07-05279 JSW (MEJ), 2008 WL 4681834, at *3 (N.D. Cal. Oct. 22, 2008) ("[A]ny documents pertaining to or memorializing the contractual agreement between [plaintiff and third-party funder] that merely contain information relating to [the third-party funder's] financial contribution are afforded no privilege"); *In re Richardson*, 31 N.J. 391, 399, 157 A.2d 695, 700 (N.J. 1960) ("[F]ee arrangements made between attorney and client are collateral to the relationship and are not a part of any confidential communication to which a claim of privilege may attach.") (internal quotation marks and citation omitted).

'agenda' held by the outsider who funds the plaintiff's case" is "an influence which need not be explicit in order to be felt." *See Conlon*, 2004 Mass. LCR LEXIS 56, at *7 n.6.

Plaintiffs have also proposed a number of apparently retaliatory questions that are superficially parallel to DePuy's request, but in fact seek irrelevant, privileged information. In particular, plaintiffs propose questions that would require defendants to divulge: (1) the names of all defense firms and lead counsel at those firms retained in defense of this action; (2) the funding arrangement for each firm, including whether the payment structure is "incentive based"; and (3) the hourly billable rates for each lawyer and professional asked to work on this matter. (*See* Proposed Defendants' Fact Sheet at 8.)  But there is absolutely no legitimate justification for discovery of this information because it is not relevant to determining the identity of the real parties in interest or any undisclosed party who may be exerting control over the litigation.  Nor do the same bias considerations that make plaintiff-funding information "clearly relevant" apply.  Accordingly, courts have repeatedly rejected such discovery as irrelevant. *MCI Telecomms. Corp. v. Crowley*, 899 S.W.2d 399, 403 (Tex. App. 1995) (plaintiffs in underlying suit were not entitled to discovery of defendant's attorneys' fees because defendant did not seek reimbursement; the information was therefore "patently irrelevant" and not reasonably calculated to lead to the discovery of admissible evidence); *Duininck Bros. v. Howe Precast, Inc.*, No. 4:06-cv-441, 2008 U.S. Dist. LEXIS 73999, at *6-7 (E.D. Tex. Sept. 22, 2008) (request for defendant attorneys' fee records were irrelevant where defendant did not seek reimbursement for legal fees) (attached as Exhibit T to Kole Cert.).

Plaintiffs' request for the "settlement value of [each] plaintiff's claim" (*see* Proposed Defendants' Fact Sheet at 8) is even more unfounded because such information is unquestionably privileged. As countless courts have explained, settlement values consist of "an

attorney's mental impressions and opinions concerning a potential litigation" and are accordingly "'core' work product which must be protected under Rule 26(b)(3)." *Anderson v. Sotheby's Inc.*, No. 04 Civ 8180 (SAS) (DFE), 2005 U.S. Dist. LEXIS 9033, at *24 (S.D.N.Y. May 13, 2005) (attached as Exhibit U to Kole Cert.); *see also, e.g., Miller v. Pruneda*, No. 3:02-CV-42, 2004 U.S. Dist. LEXIS 28254, at *21 (N.D. W. Va. Nov. 5, 2004) (document stating a settlement value was prepared in anticipation of litigation and therefore was protected by the work-product doctrine) (attached as Exhibit V to Kole Cert.).

In short, plaintiffs' proposed questions are nothing more than improper retaliation. It is third-party funding of *plaintiffs'* claims that affects how cases are litigated and how they are settled (and often leads to collateral litigation impeding the resolution of mass torts) – not the manner in which a defendant pays its counsel. For all of these reasons, third-party funding of plaintiffs' claims is "a relevant subject to explore in discovery." *Conlon*, 2004 Mass. LCR LEXIS 56, at *7.

## IV.  PLAINTIFFS' REQUESTS FOR BROADSPIRE AND LABCORP INFORMATION IN THE DEFENSE FACT SHEET SHOULD BE DENIED.

### A.  Discovery From Broadspire Should Be Denied.

Broadspire is a third party entity which handles claims by patients for reimbursement for out of pocket and other expenses associated with the recall. Defense counsel have no access to the medical records or personal information which patients have given to Broadspire. Plaintiffs seek to compel Defendants to obtain and produce from Broadpire the following: 1) Broadspire's claim file, including the date it was opened and the file number; 2) all communications between Broadspire and Plaintiff as well as descriptions of same; 3) all communications between Broadspire and Plaintiff's Healthcare Providers as well as descriptions of same; 4) all payments made to Plaintiff or others on Plaintiff's behalf, including an itemized description of each such

payment; 5) all documents that Plaintiff has provided to Broadspire; 6) all documents that Broadspire and/or LabCorp[5] have obtained from sources other than Plaintiff; and 7) all medical or laboratory records relating to Plaintiff.

The scope of the information that Plaintiffs seek to demand from Broadspire is overly broad and unduly burdensome, and would be costly to produce. *See* Certification of Jeffrey Sickles.  Notably, much of this information is available to Plaintiffs.  The Courts should not compel Broadspire to produce information that it obtained from Plaintiff and Plaintiff's Healthcare Providers when such information is readily available to Plaintiffs through other means. *See The Way Int'l v. Executive Risk Indem., Inc.,* No. 3:07cv294, 2009 WL 3157402, *10 (S.D. Ohio Jan. 27, 2009) ("[P]arties generally may not compel another party to produce documents that are readily available to the requesting party through other means.") (attached as Exhibit W to Kole Cert.); *see also* Fed. R. Civ. P. 45(c) (when seeking information from a non-party, requesting party must "take reasonable steps to avoid imposing undue burden or expense").  Moreover, Plaintiffs seek to require Broadspire to not only produce the documents in its possession, custody and control but also to provide descriptions of them.  Plaintiffs' requests for information from Broadspire pose an undue burden.

Plaintiffs' request for the Broadspire information is further inappropriate because it requires that Defendants collect this information from a non-party.  Broadspire is a separate corporate entity; it is not part of or affiliated with Defendants.  Rather, Broadspire is an independent claims processor that DePuy engaged to evaluate patients' claims and to reimburse them for the expenses they incur in the course of their treatment.  Because DePuy and Broadspire

---

[5] The issues involving LabCorp are discussed below.

are different companies, DePuy is not in possession of Broadspire's files. A party's obligation to produce documents and tangible things extends only to information within its possession, custody, or control. *See* Fed. R. Civ. P. 34(a)(1); Cal. Code Civ. Proc., § 2031.010(a); N.J. Court R. 4:18-1(a). Since DePuy does not have Broadspire's documents and files, Plaintiffs cannot compel Defendants to produce information from a separate and distinct non-party entity. *See e.g., People ex rel. Lockyer v. Superior Court,* 19 Cal. Rptr. 3d 324, 337-38 (Cal. App. 4 Dist. 2004) (requiring party to issue subpoenas to obtain documents from non-party government agencies as each agency is a separate and distinct entity such that the People did not have possession, custody or control of the documents of other agencies).

Even if Defendants were able to obtain the requested information from Broadspire, doing so would be unduly expensive. In the spirit of cooperation, Defendants inquired about the fees associated with obtaining Broadspire's claims notes and a list of payments made on behalf of Plaintiffs. To provide just this subset of the information sought in Plaintiffs' overly broad requests, Broadspire advised that it will charge $10,000 and then another $1,000 for each set of claimants to query. *See* Certification of Jeffrey Sickles. Given the number of Plaintiffs at issue and the cost associated with the information that Plaintiffs seek, this request should be stricken from the DFS as unduly expensive. To the extent that Plaintiffs insist on receiving the panoply of identified Broadspire information for each Plaintiff for whom a DFS is required, Defendants request that Plaintiffs be required to bear the costs associated with obtaining this information from Broadspire.

Setting aside the burden associated with providing information from Broadspire for each Plaintiff at this preliminary stage of the litigation, Defendants recognize that, later, certain information possessed by Broadspire may be likely to lead to the discovery of admissible

information. Accordingly, Defendants have offered to provide the aforementioned claims notes and reimbursement histories from Broadspire during the course of fact discovery in connection with bellwether and trial pool cases. To date, Plaintiffs have not agreed to compromise in this fashion.

Because Plaintiffs' requests for information from Broadspire are overly broad, unduly burdensome, unduly expensive, improperly interposed demands from a non-party to the litigation, Defendants submit that this information should not be included in the DFS.

**B.      Discovery From LabCorp Should Be Denied.**

Plaintiffs seek to require Defendants to obtain Plaintiffs' lab results from Laboratory Corporation of America ("LabCorp"), another non-party, separate and distinct from both Broadspire and Defendants. LabCorp is an independent testing company over which Defendants have no control. For the same reasons set forth at length above, it would be improper to require Defendants to obtain Plaintiffs' own lab results from a nonparty testing company. To the extent that Plaintiffs want or need information from LabCorp, Plaintiffs and their healthcare providers are in a better position to obtain this information directly from the lab. Accordingly, because Plaintiffs' requests for information from LabCorp are unduly burdensome, improperly interposed demands from a non-party to the litigation, Defendants submit that this information should not be included in the DFS.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court enter an order

approving Defendants' proposed Plaintiff Fact Sheet and Defendants' Fact Sheet, Exhibits A and

B to the Kole Cert.

|  | Respectfully submitted, |
|---|---|
| Robert C. Tucker (Ohio Bar 0013098)<br>S. Peter Voudouris (Ohio Bar 0059957)<br>Kristen L. Mayer (Ohio Bar 0055505)<br>TUCKER, ELLIS & WEST LLP<br>1150 Huntington Building<br>925 Euclid Avenue<br>Cleveland, Ohio  44115<br>Telephone: (216) 592-5000<br>Telefax:      (216) 592-5009<br>E-mail:      robert.tucker@tuckerellis.com<br>        peter.voudouris@tuckerellis.com<br>        kristen.mayer@tuckerellis.com | *s/Susan M. Sharko*<br>Susan M. Sharko<br>DRINKER, BIDDLE & REATH LLP<br>500 Campus Drive<br>Florham Park, NJ  07932<br>Telephone: (973) 549-7000<br>Telefax:      (973) 360-9831<br>E-mail:      susan.sharko@dbr.com |
| *Attorneys for Defendants DePuy Orthopaedics, Inc.* ||

SF01/ 777552.5

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August, 2011, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's System.

Attorneys for Defendant
DePuy Orthopaedics, Inc.